IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NICKIE G.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 3730 |
| v. | ) | |
| | ) | Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security,[2] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[3]

Plaintiff Nickie G. filed for disability benefits in November 2016, at age 51. Plaintiff alleges she became disabled in November 2016, due to mental impairments, obesity, and osteoarthritis.[4] (R. 243). Before the Court is Plaintiff's motion seeking remand of the Administrative Law Judge's ("ALJ") opinion denying her application for disability benefits.[5]

**I.      Administrative Record**

From March 2016 through June 13, 2017, Plaintiff visited Elton W. Dixon, M.D., of Suburban PainCare Center once a month to treat her pain from bilateral knee osteoarthritis. He

---

[1] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court.

[2] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On August 3, 2020, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 11.)

[4] Plaintiff also alleged disability based on hypertension and hepatitis C, but she does not take issue with the ALJ's determination that these impairments were not severe (R. 15), and the Court does not address those impairments in this opinion.

[5] The Appeals Council ("AC") subsequently denied review of the opinion (R. 1), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

prescribed the opioid analgesics Norco during the day and MS Contin at night. (R. 457-69, 518, 522.) Dr. Dixon's notes indicated that Plaintiff ambulated with a cane, had decreased range of motion ("ROM") in her right knee (with no further details of ROM), and occasional pain with movement, but no weakness. (*Id*.) Plaintiff was obese; she was 5 feet 8 inches tall and ranged from 287 to 336 pounds. (*See* R. 45, 418-19.)

Plaintiff received mental health treatment from Yvette Johnson, APN, who prescribed Xanax (for anxiety), Lamcital (can be used to treat bipolar disorder), and antidepressants (at various times, olanzapine, Lexapro, sertraline and trazodone). (R. 427-51.) In 2016 and early 2017, Ms. Johnson consistently recorded Plaintiff's musculoskeletal and psychiatric exams as normal; she indicated that Plaintiff was not in pain, had normal gait and muscle strength, was fully oriented and had no depression, anxiety or agitation, except for visits in November 2016 and March 2017, when Plaintiff's mood and affect were anxious. (*Id*., 491-92) In January 2017, Plaintiff indicated she was "doing well" on her medications. (R. 414.)

On January 27, 2017, Plaintiff wrote in a disability function report that she had panic attacks and depression, which kept her in bed for hours at a time, and her knee problems made it hard to dress and shower. (R. 265-66, 270.) Plaintiff was able to do laundry, prepare meals, shop for food and necessities as needed, go to the doctor, attend therapy and manage her finances. (R. 267-69.) On March 10, Plaintiff's adult son George filled out a report indicating that he took his mom to the doctor and shopping for personal items, and he did all the other shopping.[6] (R. 275-78, 282.) George wrote that some days she did not get out of bed, and he had to coax her to shower. (R. 275-76.) Her hobbies included crafts, crocheting and watching television, but she had trouble doing any activity involving her knees, and she did not finish what she started. (R. 279-80.)

---

[6] George wrote that his mother lived with different friends every few weeks (R. 275), but later that month, Ms. Johnson noted that Plaintiff lived with her son. (R. 492.)

2

On June 7, 2017, Ms. Johnson noted that Plaintiff was distraught, tearful, anxious and focused on her physical issues, although her musculoskeletal exam was normal (with normal gait, muscle tone and strength), as was her mental status exam, except for depressed mood and distracted concentration. (R. 480, 482.) Ms. Johnson prescribed two antipsychotic medications – Seroquel and haloperidol – and discontinued sertraline and trazodone. (R. 483.)

On June 21, Plaintiff went to the emergency department ("ED") complaining of right-sided pelvic pain radiating to the lower back. (R. 734.) She was discharged the same day with a prescription for Norco. (R. 744, 760.) On July 6, Plaintiff had a new patient evaluation with the Cook County pain clinic for pain in her hip, knee and lower back; she walked with a cane, and on examination, her ROM was limited by pain, and she was tender to palpation. (R. 558, 563, 565-66.) Her mental status exam was normal. (R. 560, 565.) The attending physician noted Plaintiff was "seeking a new provider because her last pain doctor no longer provides opiates," and she ran out of Norco. (R. 566.) The physician offered Plaintiff alternatives to Norco, but she declined. (*Id*.)

On July 12, Plaintiff went to another pain clinic, Pain Specialists of Greater Chicago. Scott McDaniel, M.D., observed Plaintiff's gait was antalgic, she used a cane, and she had severe pain in her right knee with palpation. (R. 837-39.) Her mental status exam was normal. (*Id*.) Plaintiff reported that she had been told she was not a surgical candidate, and Dr. McDaniel prescribed Norco and MS Contin. (*Id*.) On August 9, Plaintiff's exam and complaints of pain were essentially the same. (R. 833-34.) Dr. McDaniel continued to prescribe Norco and MS Contin for pain and noted that Plaintiff was "hopeful to get appointment at Cook County for right knee soon." (R. 834.)

On August 20, Plaintiff went to the ED complaining of chest and abdominal pain as well as right knee and back pain. (R. 670, 691, 702.) On exam, she had no tenderness, full strength and "good ROM" in her right knee; she was able to walk with a mild limp on the right but steady gait.

3

(R. 703-04, 721.) Echocardiogram and exercise stress tests showed normal to mild findings. (R. 765-67.) Plaintiff was discharged on August 22 after pain relief from medication. (R. 680, 684.)

On August 23, 2017, Plaintiff underwent an internal medicine consultative examination with M.S. Patil, M.D. Dr. Patil wrote that Plaintiff was a "poor historian," as she was "guarded and reluctant to answer pertinent medical questions." (R. 525.) She "was constantly complaining of 'pain everywhere'" and "all the time," but examination showed full motor strength in her upper and lower extremities, no tenderness in her back, normal gait and tandem walk, and normal ability to get up from her chair and walk 50 feet without a cane. (R. 525-27.) She was "uncooperative" for evaluation of her ROM; she insisted she "cannot do it" due to pain. (*Id*.) Without a cane, Plaintiff stood "with some difficulty." (R. 527.) Her mental status exam showed blunted affect, guarded mood, and poor to fair concentration because she was "constantly" distracted with complaints of pain. (R. 528.) X-rays in 2017 showed Plaintiff had moderate to severe osteoarthritis and markedly reduced joint space in the right knee. (R. 528, 530, 586.)

On September 16, 2017, Plaintiff underwent a psychological consultative exam. She was fully oriented, cooperative and attentive, and her mood and affect were sad and at times tearful. (R. 535-36.) Based on Plaintiff's reports, she was diagnosed with PTSD and adjustment disorder with anxious mood. (R. 536.) Her immediate recall and abstract ability were poor, although testing results were otherwise "fair." (*Id*.) The examiner stated Plaintiff "did not appear to have the capacity" to manage her own funds. (*Id*.)

Following these exams, the non-examining state agency mental health consultant opined that Plaintiff had a severe mental impairment with moderate limitations in understanding, remembering or applying information and concentrating, persisting or maintaining pace; and mild limitations in interacting with others and adapting or managing oneself. (R. 88-89.) The non-

4

examining state agency medical consultant opined that Plaintiff had the residual functional capacity ("RFC") for light work; she could lift 20 pounds occasionally, 10 pounds frequently, and could stand, walk or sit six hours in an eight-hour day with postural limitations. (R. 75-76, 91-92.)

Plaintiff saw Dr. McDaniel four more times from September through December 6, 2017, for pain in her right knee, low back and hip, receiving the same opioid treatment as in July and August. (R. 822-30.) On December 6, he discharged Plaintiff from his practice because her November urine screen was positive for heroin, and he could no longer treat her with opioids. (R. 820.) Plaintiff refused his offer for a referral to an addictionologist. (*Id*.)

After December 2017, Plaintiff cites to only two more medical records: a September 2018 left knee X-ray showing moderate osteoarthritis and a visit to a new behavioral health provider in February 2019, Diana Wells, who wrote that Plaintiff's mental status exam was normal, but that she displayed depressed mood, circumstantial thought process, psychomotor agitation, fidgeting, and anxious mood; her physical exam and gait were normal. (D.E. 20: Pl. Mem. at 5-6, citing R. 1056, 1289-90.) In addition, Plaintiff cites to the July 2018 "treating source opinion" of "Ms. Armstrong, LCPC," which indicates that she had treated Plaintiff monthly since January 2018 for diagnoses of "depression/anxiety and PTSD/domestic abuse." (*Id*., citing R. 539-41.) Ms. Armstrong checked boxes opining Plaintiff would be off task more than 30 percent of workday due to limitations in understanding, remembering and carrying out detailed instructions; maintaining attention and concentration; and working in coordination with others without being distracted. (R. 540-41.) Plaintiff also cited to a February 2019 RFC opinion by Dr. Lester Hockenberry, whom Plaintiff refers to as her "primary care physician," and a two-sentence letter from nurse practitioner Denise Bockwold in July 2018. (Pl. Mem. at 5.) Ms. Bockwold's letter stated that Plaintiff was "under treatment for numerous medical conditions that render[ed] her

5

unable to attain meaningful employment," and attached copies of various X-rays, lab results and medical reports without explanation. (R. 543-56.) Dr. Hockenberry's RFC opinion, which appears to have been filled out and signed by Ms. Bockwold, checked boxes indicating that Plaintiff's stress and pain would interfere, frequently to constantly, with her attention and concentration; she would be off task more than 30 percent of the workday; and during the workday, she could sit for 30 minutes at a time and two hours total, stand/walk for 20 minutes at a time and one hour total, use her arms 10 to 30 percent of the day, and use her hands/fingers 40 percent of day. (R. 608-11.)

## II.     April 2, 2019 Hearing Before the ALJ

Plaintiff was tearful at the hearing, testifying that she lived alone in a house with two dogs, and some days she could not leave the house because she got very excitable, upset and mean when she was in pain. (R. 42-25, 51-53.) She testified that she took Norco for pain in her knees and used a cane "constantly" because she was not very stable on her feet, but she had no difficulty sitting. (R. 42-46, 49, 54-55, 60.) Plaintiff dressed and washed herself, prepared meals and cleaned up the house but her son did yardwork, took out the trash and helped her shop. (R. 55-57.)

The vocational expert ("VE") testified that an individual limited to light work with occasional ramps, stairs, stooping, kneeling, crouching and crawling; no ladders, ropes or scaffolds; and simple and routine tasks with no fast-paced production requirements could do the job of cleaner/housekeeping, 323.687-014, for which about 400,000 jobs were available nationally. (R. 63.) If Plaintiff needed to use a cane all day, no jobs would be available. (R. 63-64.)

## III.    May 24, 2019 ALJ Opinion

The ALJ determined that Plaintiff had the severe impairments of osteoarthritis, obesity and depression but that her impairments, alone or in combination, do not meet a Listing. (R. 15.) The ALJ determined that Plaintiff had moderate restriction in understanding, remembering and

6

applying information and concentrating, persisting or maintaining pace, and mild restriction in interacting with others and adapting and managing oneself. (R. 16-17.) In making this determination, the ALJ relied on evidence that Plaintiff attended church, spent time with a friend, used public transportation, shopped in stores, had a supportive relationship with her son, "admitted ability to manage her personal finances, binge watch television, and crochet," lived alone with her two dogs, washed and dressed herself, prepared meals, washed dishes, did laundry and cleaned up around the house. (R. 16-17.) The ALJ recognized that Plaintiff was limited by physical issues and relied heavily on help from her son, such as in taking out the trash due to difficulty lifting. (*Id*.) The ALJ assigned Plaintiff an RFC to perform light work, limited to occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs; never climbing ladders, ropes or scaffolds; no exposure to hazardous machinery and unprotected heights; and performing simple, routine tasks in an environment with no fast-paced production requirements. (R. 17.) The ALJ stated that he "generously consider[ed] [Plaintiff's] weight and its effect on her ability to ambulate as well as her other body systems." (R. 16.)

After reviewing the evidence, the ALJ concluded that the record did not support Plaintiff's allegations of debilitating physical impairments because "examination throughout repeatedly noted a normal gait and strength," and there was a "lack of physical therapy, joint injections, or the suggestion of surgical intervention." (R. 19.) In addition, the ALJ found that "the record in 2018 and 2019, [after Plaintiff] violated her substance use contract, shows very little treatment for her osteoarthritis." (*Id*.) The ALJ concluded that "despite positive imaging and the compounding effect of obesity, the record supports no more than light exertional limitations with the additional postural and environmental limitations" in the RFC. (*Id*.) Likewise, the ALJ found that the record did not support Plaintiff's allegations of debilitating mental impairments because while she

7

"repeatedly presented with depressed mood and anxiety, [she] conceded that medication management and individual therapy were helpful," mental status exams reflected only "mild to moderate functional issues," and there was no need for psychiatric hospitalization. (R. 19-20.)

The ALJ found that the state agency physical RFC opinions were "generally consistent" with the evidence, "including the repeat findings of a normal gait and the lack of significant treatment in the last year," and that imaging supported "the further restriction to never climbing ladders, ropes, or scaffolds, and occasionally stooping." (R. 20.) The ALJ determined that the "extensive limitations" in Dr. Hockenberry's opinion were "not supported by the longitudinal record" and deserved little weight because "while there is imaging to support knee and lumbosacral conditions, the treatment record does not include clinical signs supporting an inability to sit or any issue with manipulation, and despite mentions of the need for ambulatory aides, gait was repeatedly found to be normal with normal strength." (*Id*.) In addition, the ALJ found that "considering the lack of treatment for the musculoskeletal condition in the last year, the record does not support a need for significant off task time or missed workdays." (*Id*.)

The ALJ gave "significant weight" to the state agency mental RFC opinion, which "opined that [Plaintiff] could perform simple, routine and/or repetitive tasks; sustain a simple, routine and/or repetitive task over the course of a normal workday and work week without interference from significant psychologically based symptoms; adapt to the customary demands of work in a competitive work setting where tasks are simple, routine, and/or competitive; and . . . get along without difficulty with co-workers and supervisors." (R. 20, citing R. 94.) The ALJ determined this opinion was "generally consistent with the evidence showing stability with conservative medication management and individualized therapy" and was "more than sufficiently accommodated by a restriction to performing simple, routine tasks in an environment with no fast[-

]paced production requirements." (R. 20-21.) The ALJ gave little weight to Ms. Armstrong's opinion (misspelled as "Armisy") because "mental status examinations do not support the need for significant off task time or missed workdays," and "based on her ability to live alone, manage her personal finances, and follow instructions, the finding of reduced efficiency [was] not consistent with [Plaintiff's] assertions." (R. 21.) The ALJ also found the opinion "inconsistent with the longitudinal record showing only mild to moderate functional restrictions." (*Id*.)

The ALJ summarized the support for the RFC as: "the lack of recent treatment beyond medication management for the last year, serial clinical findings of a normal gait, the [state agency physical RFC] opinion [], modified based on the historical imaging, [Plaintiff's] ability to live alone and interact with friends, conservative psychotropic and individual therapy, no suggestion of the need for psychiatric hospitalization, and the [state agency mental health RFC] opinions . . ." (R. 21.) Plaintiff had no past relevant work at Step 4, and at Step 5, the ALJ accepted the VE's testimony that jobs exist in significant numbers in the national economy that Plaintiff can perform, specifically, the occupation of cleaner/housekeeping with 400,000 jobs. (R. 21-22.)[7]

## IV. Analysis

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a

---

[7] Plaintiff suggests in a footnote that the "occupational base" in Step 5 was "inadequate" because the VE provided one, as opposed to three, representative jobs. (Pl.'s Mem. at 8 n.1.) However, Plaintiff "forfeit[ed] any challenge to the VE's testimony" because she did not object to the VE's testimony at the hearing. *Fetting v. Kijakazi*, 62 F.4th 332, 338 (7th Cir. 2023). Moreover, Plaintiff's argument is a non-starter, because while the Programs Operation Manual for Social Security asks for three job examples, that "is not a regulation and therefore has no legal force and does not even bind the SSA." *Gwendolyn B. v. Saul*, No. 20 C 3244, 2021 WL 1812879, at *5 (N.D. Ill. May 6, 2021) (internal citations and quotations omitted). "[T]he question is not the number of examples of jobs, but whether those jobs – or even one job – exist in significant numbers in the national economy." *Id*. Plaintiff does not suggest that 400,000 jobs are not a "significant" number of jobs at Step 5, and far less than that number has been deemed significant under Seventh Circuit case law. The ALJ has "discretion to decide, using substantial evidence, when a number of jobs qualifies as significant." *Milhem v. Kijakazi*, 52 F.4th 688, 696-97 (7th Cir. 2022) (citing cases finding 10,000 and 32,000 jobs available nationally to be significant).

conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination. Rather, this court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (citations and quotations omitted).

      **A.**    **The ALJ's Physical RFC Determination Was Supported By Substantial Evidence.**

Plaintiff contends that the ALJ erred by not finding that she needed a cane at all times and failing to properly factor in the effects of her "extreme obesity." (Pl.'s Mem. at 8-10, 14-15.) Plaintiff acknowledges that the ALJ "alluded" to her use of a cane "occasionally," but argues that remand is necessary because the ALJ "neglected to mention" a few of Dr. McDaniel's notes indicating that she used a cane and had an antalgic gait and a September 2016 note that she used a cane. (*Id*. at 9-10.) Although ALJs "cannot rely solely on the parts of the record that support [their] opinion[s] in reaching [their] conclusion, . . . [they] also need not mention every piece of evidence, so long as [they] build[] a logical bridge from the evidence to [their] conclusion." *Bakke v. Kijakazi*, 62 F.4th 1061, 1069 (7th Cir. 2023) (internal quotations and citations omitted). Contrary to Plaintiff's argument, the ALJ did not "cherry pick" or rely on "lay interpretations" in determining her physical RFC. (Pl.'s Mem. at 9-10.) Rather, the ALJ considered "mentions of [her] need for ambulatory aides," and found them outweighed by evidence of "repeat findings of a normal gait" and "normal strength," the consultative examiner's observation that Plaintiff could "walk normally for 50 feet without a cane," the "lack of treatment for [her] musculoskeletal condition in the last year," and the state agency RFC opinions excluding the need for a cane. (R. 18, 20.) "This explicit weighing is precisely within the purview of the ALJ—and it is not our place

10

to reweigh evidence, even where reasonable minds might disagree about the outcome." *Bakke*, 62 F.4th at 1068. The ALJ's decision was supported by substantial evidence.[8]

Plaintiff also takes issue with the ALJ's description of Plaintiff as severely obese, with a BMI exceeding 41, because she was "extreme[ly]" obese and her BMI exceeded 42. (Pl.'s Mem. at 14-15.) Regardless of the ALJ's description of Plaintiff's obesity, the ALJ considered, as required, "the compounding effect of obesity" on Plaintiff's ability to function. (R. 16, 19.) Moreover, it was Plaintiff's burden to present evidence of the effect of obesity on her limitations, *Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022), but Plaintiff did not do so, instead speculating, without evidence, that "[i]t is quite likely" that Plaintiff's difficulties "would be significantly exacerbated" and "also likely that Plaintiff's right knee replacement surgery . . . might be precluded by her extreme obesity." (Pl.'s Mem. at 15.)

### B. The ALJ's Mental RFC Determination Was Supported By Substantial Evidence.

Plaintiff also argues that contrary to the ALJ's determination, mental status exams showed that she had more than mild to moderate functional limitations. This argument again asks the Court to reweigh the evidence, which we will not do. Plaintiff contends that the ALJ should have given more weight to treatment notes that support her disability claim and less weight to the evidence that does not support it. (Pl.'s Mem. at 12-13, citing notes from September and December 2016, June and August 2017, and February 2019.) Instead, the ALJ recognized that Plaintiff "repeatedly presented with depressed mood and anxiety," but found that "serial mental status exams" showing

---

[8] Plaintiff argues in passing that the ALJ erred in rejecting Dr. Hockenberry's assessment because he was a treating physician who was entitled to deference. (Pl.'s Mem. at 9.) However, "[t]his is the entirety" of Plaintiff's treating physician argument, and we "need not address such a perfunctory argument." *Bakke*, 62 F.4th at 1070 n.6. Nevertheless, we note that the ALJ went through the treating physician factors and supported his decision to give little weight to Dr. Hockenberry's opinion (including as to alleged deficits in attention and concentration to which Plaintiff makes passing reference at Pl.'s Mem. at 14) with substantial evidence.

mild to moderate functional issues, "the lack of recent treatment beyond medication management for the last year," Plaintiff's "ability to live alone and interact with friends," her improvement with "conservative psychotropic and individual therapy," and the state agency mental health RFC opinions" demonstrated that Plaintiff was not more limited than the ALJ found. (R. 19-21.)[9] "This explicit weighing is precisely within the purview of the ALJ." *Bakke*, 62 F.4th at 1068.

Plaintiff contends that the ALJ put too much weight on the fact that medication and therapy "helped her" and that she "attends church, spent time with a friend, used public transportation, [] had a supportive relationship with her son, manage[d] her personal finances, binge watch[ed] television, [] crochet[ed,] manages her personal hygiene[,] performs chores, and live[s] alone." (Pl.'s Mem. at 11-12.) "An ALJ may not equate activities of daily living with those of a full-time job. But an ALJ is not forbidden from considering statements about a claimant's daily life. In fact, agency regulations instruct that, in an assessment of a claimant's symptoms, the evidence considered includes descriptions of daily-living activities." *Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020), citing 20 C.F.R. § 404.1529(a), (c)(3). The ALJ here did not equate Plaintiff's activities with the ability to perform full-time work. Rather, the ALJ properly considered Plaintiff's activities "to determine whether her symptoms were as severe and limiting as she alleged" and concluded that her "activities of daily living, alongside other evidence, showed that [Plaintiff's] mental impairments were characterized by no more than moderate limitations." *Id*. at 592-93.

Alternatively, Plaintiff argues that the RFC does not adequately accommodate her moderate limitations in concentration, persistence and maintaining pace. (Pl.'s Mem. at 13.) The ALJ limited Plaintiff to "performing simple, routine tasks in an environment with no fast[-]paced

---

[9] Plaintiff also argues that the ALJ improperly rejected the opinion of Ms. Armstrong based on his "layperson" opinion. (Pl.'s Mem. at 14.) This is incorrect. The ALJ relied on the aforementioned medical evidence to find that Ms. Armstrong's opinion was "inconsistent with the longitudinal record." (R. 21.)

12

production requirements." (R. 17.) Plaintiff argues that this RFC is inadequate under *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010), but that case is inapposite. *O'Connor-Spinner* held that "terms like simple, repetitive tasks on their own" may not account for moderate limitations in concentration, persistence or pace because "[t]he ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *Id*. Here, however, the ALJ specifically called for no fast-paced production requirements in addition to simple, routine tasks, an RFC that accorded with the opinion of the non-examining state agency mental health consultant. (*See* R. 20, citing R. 94.) "And notably, 'it is unclear what kinds of work restrictions might address [Plaintiff's] limitations in concentration, persistence, or pace because [s]he hypothesizes none.'" *Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021), quoting *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019). Accordingly, the ALJ's RFC determination was supported by substantial evidence.

## CONCLUSION

For these reasons, the Court denies Plaintiff's motion to remand (D.E. 19) and affirms the ALJ's decision.

**ENTER:**

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: April 25, 2023**